This case is controlled by the decision in Drane v. State, 147 Ga. 212 (93 S.E. 217), which we think was sound in principle, and in which the facts were very similar to those disclosed by the present record. As in that case, it must be held that the court erred in not charging the jury on the law of voluntary manslaughter.
Judgment reversed. All the Justices concur.
 No. 13103. NOVEMBER 29, 1939.
Robert Lee Weaver was found guilty, with a recommendation to mercy, of the murder of Sallie Mae Hubbard by a pistol shot. Ralph Hill, a first cousin of the deceased's mother, testified for the State, that the defendant had occasionally visited and gone with the deceased; that he found them arguing at the house of her mother at 8 or 8:30 at night, and the shooting occurred about 12 o'clock; that the defendant and the deceased went outside of the house, the defendant having a pistol, and were cursing each other, but neither was making any threat; that the deceased "started around to her mother's house, around in front, and Robert [the defendant] . . came down the steps and caught her, and slapped her, and pushed her up against the house, and shot her right in her left breast;" that "at no time while they were arguing did I hear Sallie Mae [the deceased] say anything to him. . . There are two houses, and then there is another little room in the back, where they started the last argument, and he shot at her coming down the steps. Just before he shot her, he called to her and told her to wait a minute. As to *Page 340 
how long that was before he shot her, when she came down the steps he had shot her. I didn't know what they were talking about. When he called to her to wait a minute, she waited. . . He shot twice, shot at her coming down the steps. I don't know whether he told her to wait before he shot or after he shot. He came out of the house, and he shot at her coming down the steps. . . She had not done anything to him in my presence, hit him, stuck him, pushed him, with a knife, did not have a weapon in her hand, nothing of that kind. They never lived together, that I know of, no more than a night or two at a time, something like that. He has a wife himself. She was not married. . . [The defendant] did not furnish the liquor there at that party. He went off and got liquor and went around back next door and drunk it. . . They first started arguing about 8 o'clock in" the room of "the mother of the girl. . . I heard the shot. I told her to come home. He told her to stop, and shot her again, pushed her up against the house and shot her. . . There were not some girls fighting there. There was no fighting at all, except the quarrel between this boy and the girl that was killed. . . I don't know what it was about. . . I think he was mad at her about some boy around there. . . They did not argue so long in there. They were arguing in and out, on the porch. Robert went and got some whisky. They kept on arguing."
Maggie Hubbard, mother of the deceased, testified, that before her daughter was shot she heard the defendant cursing her daughter; that there were three rooms in the house, the daughter and three others living in one room with her; and that she heard only one shot, which fatally wounded her daughter.
Hugh Emerson, who lived across the alley from the place of the homicide, testified that he heard some shots that night. "I heard one. I was standing in the door when the shot was made. I was in the house when I heard the noise. The shot was made after the noise started. . . They were arguing, going on, throwing things at the house. . . They ran out of the house out in the street . . in front of my door. . . That was Jennie Mae's house, right across in front of me. . . When [the deceased] fell, I was standing in my door. I saw her. I did not hear her say anything to this man, only say that she was shot. She said that Robert Lee shot her. . . He said, `I shot you. I reckon I will have to go down for it.' That is all I saw and all I heard. I saw the fire of *Page 341 
the gun or pistol. That's all. I could not see the gun. . . I did not see her at any time have anything in her hand. She did not have anything in her hand, just ran up and down the alley. I did not get close enough to see, because I did not go out there. . . There was nobody in the alleyway but the boy and girl when she got shot. . . She started through the alley, going home, when he called her back. She had been around that way once before. They were in the house there. I did not see any pistol . . I heard the shot and saw the fire. . . I did not see in that house where I said such a crowd gathered; what went on in there, I don't know."
James Weaver, a brother of the defendant, testified that he was with the defendant and others on the night of the shooting, at the room of a girl named Jennie Mae; that "Sallie Mae came in, that is the girl that got shot. Jennie Mae and Sallie Mae had an argument which turned out to be a fight. . . and Robert [the defendant] and a fellow by the name of Banks were acting as peacemakers, and they fought there for a while, and Sallie Mae . . grabbed a lamp to throw the lamp at this girl, and the pistol was laying on the table, and she grabbed the lamp and the pistol up about the same time, and all I heard was the report of it. She grabbed up a light lamp. It went out. She threw the lamp. . . Robert tried to hold her, and Banks tried to hold this other girl. I do not know what became of the pistol that she picked up. I heard the report. The room was dark when she threw the lamp. There had not been any argument between Robert and Sallie Mae, so far as I knew anything about. I know when they started fighting, just started fighting this fellow Banks; and Sallie Mae and Robert, when she grabbed the lamp and pistol, she threw the lamp with one hand and she held on to the pistol with the other hand, and Robert took hold of her after he took the pistol away. That's all I know. When she threw the lamp it was dark in there. I could not see any more. I heard one report. I was in there during the fight. After the report everybody came out of the house. I did not hear him or her say anything, but before the fight, when the argument began, I carried her home to her mother. I don't know what time it was, the exact time, but I estimate it to be between 2:30 and 3 o'clock. . . We had this drinking, everybody drinking. We consumed whisky." On cross-examination: "Willie Mae and Jennie Mae and *Page 342 
Sallie Mae and Banks were the folks that were there that night in the room. . . I did not hear but one shot fired. . . I carried her to her mother's house. As to how far it was from her house to the house where the shooting happened, it was all the same house, but just a different apartment, a different part of the house. . . There is only one story. . . There is three rooms. . . When I was carrying this girl into her mother's home, she was drunk and raging, trying to fight everybody in the house. Her and Jennie Mae were fighting. I did not see any blood on her then. She had not been shot then. . . When I got her in her mother's house, I carried her there and she sat down in a chair. I could not say how long that was before she got shot. I had not already heard the shot when I took her to her mother's house. I was in Jennie Mae's room when I heard the shot. At that time, before the lights went out, myself and brother and Jennie Mae and Sallie Mae and Willie Mae and Banks were in the room. I could not say which hand of hers picked up the lamp with, or the pistol with. . . Her back was to my face. I saw her grab the lamp. . . I saw her snatch them off the table and the chimney fell off the lamp, and she threw it. When she snatched the lamp up, it went out. There was no other light in that room. I do not know that she did not drop it. I do not know whether she threw it or not. As to when [I saw] her again, she followed me right on back, came right on back with me. After I heard the lamp fall, or it was thrown, whichever it was, I heard the report. I could not say how long that was after the lamp went out. . . The lamp and pistol were lying on the table, and she grabbed the lamp and the pistol, and my brother grabbed at her, at the gun, and the lamp went out, and I just supposed that she threw it. . . I said, when she grabbed at the lamp and pistol, he grabbed at the pistol, the hand she had the pistol in, I suppose. I could not [see] which hand my brother grabbed at, because I could not see what hand that she had the gun in. I was directly behind her back. . . I saw her pick up the lamp. I did not see her pick up the pistol."
The defendant stated to the jury that there were four at the house of the woman named Jennie Mae; that Sallie Mae (the deceased) "got up and taken up what I was saying" (about drinking and paying a fine). "So we got to fighting. Jennie Mae grabbed Sallie Mae in the breast. I pulled her loose. By her running *Page 343 
backwards she fell over a chair. Sallie Mae grabbed a gun that was laying on the dresser. I grabbed her. I pulled her facing me, and was tussling, trying to take it away from her. The gun went off and shot her, and she turned and grabbed a lamp. She was already facing me. I went to grab the lamp out of her hand, and she struck my hand with the gun and knocked the gun out. I grabbed her and pulled her in the yard and taken her to her Mama. She said, `I am shot.'. . I had been drinking and the whisky was working on me, and I went to catch some air. . . I did not do it intentionally. I am sorry it happened."
Recalled by the State, Ralph Hill testified that "the first shot he shot at her coming down the steps, it was at the end of the porch. The second shot was middleways of the alley between the two houses. There were two shots. Both shots were outside. . . When I heard the first shot, I got up and went around there and told her to go in her house and go to bed. She said she would. She started like I told her. He called her, and she stood there two or three minutes. About four or five minutes elapsed from one shot to the other, because they stood there talking for a few minutes, and he slapped her and pushed her against the house and shot her."
Recalled for the defendant, Hugh Emerson testified: "I heard one shot. I seen one. I did not see two. I did not see but one. I stood close enough that if there had been two shots I would have heard it. I would have heard it if there had been two from the time I got there. When I got to the door they were coming out of the house. Some of them were throwing a smoothing-iron and ironing-board. They were hollering and cursing. I did not hear nary shot until the shot was made and she was shot." Cross-examined, he said: "I did not see anybody throwing an iron. I heard them throwing them. I could tell what they were throwing by the sound. I seen them the next morning. What happened before I got to the door I don't know. It was a disturbance was all."
The judge charged only the law of murder and the contention that the shooting was an accident. In addition to the general grounds, the defendant excepted on the ground that under the testimony the defendant and the deceased had been and still were engaged in fighting at the time of the homicide; and that the court should have charged, without a request, the law of voluntary manslaughter as to a substantial issue in the case. *Page 344